1
2
3
4
5
6
7
8                          UNITED STATES DISTRICT COURT
                          WESTERN DISTRICT OF WASHINGTON
9                                   AT TACOMA

10   GLORIA J. BLACKMAN,
                                                CASE NO.      C09-5026RJB-KLS
11                          Plaintiff,
                                                REPORT AND
12          v.                                  RECOMMENDATION

13   MICHAEL J. ASTRUE, Commissioner of         Noted for November 20, 2009
     Social Security,
14
                            Defendant.
15

16

17

18

19

20         Plaintiff, Gloria J. Blackman, has brought this matter for judicial review of the denial of her

21   application for disability insurance benefits.  This matter has been referred to the undersigned Magistrate

22   Judge pursuant to 28 U.S.C. § 636(b)(1)(B) and Local Rule MJR 4(a)(4) and as authorized by <u>Mathews,</u>

23   <u>Secretary of H.E.W. v. Weber</u>, 423 U.S. 261 (1976).  After reviewing the parties' briefs and the remaining

24   record, the undersigned submits the following Report and Recommendation for the Court's review.

25                            <u>FACTUAL AND PROCEDURAL HISTORY</u>

26         Plaintiff currently is 62 years old.[1] Tr. 39.  She has a general equivalency diploma and past work

27   ────────────────────

28         [1]Plaintiff's date of birth has been redacted in accordance with the General Order of the Court regarding Public Access to
     Electronic Case Files, pursuant to the official policy on privacy adopted by the Judicial Conference of the United States.

experience as a customer service representative and an accountant/bookkeeper. Tr. 23, 164, 169, 174, 190, 201, 206.

On September 27, 2002, plaintiff filed an application for disability insurance benefits, which was denied at the initial level of administrative review on November 14, 2002. Tr. 15, 41, 76. On January 27, 2006, plaintiff filed another application for disability insurance benefits, alleging disability as of June 2, 2001 – later amended to June 1, 2004 – due to fibromyalgia, later adding anxiety and a bipolar disorder. Tr. 15, 82, 94, 168. Her application was denied initially and on reconsideration. Tr. 15, 39-40, 68, 73.

A hearing was held before an administrative law judge ("ALJ") on May 8, 2008, at which plaintiff, represented by counsel, appeared and testified, as did a medical expert. Tr. 573-96. On June 16, 2008, the ALJ issued a decision, determining plaintiff to be not disabled, finding specifically in relevant part:

(1)     at step one of the sequential disability evaluation process,[2] plaintiff had not engaged in substantial gainful activity since her amended alleged onset date of disability;

(2)     at step two, plaintiff had a "severe" impairment consisting of fibromyalgia;

(3)     at step three, none of plaintiff's impairments met or equaled the criteria of any of those listed in 20 C.F.R. Part 404, Subpart P, Appendix 1;

(4)     after step three but before step four, plaintiff had the residual functional capacity to perform a wide range of light work, with certain additional limitations on walking and prolonged sitting; and

(5)     at step four, plaintiff could perform her past relevant work.

Tr. 15-23. Plaintiff's request for review was denied by the Appeals Council on December 5, 2008, making the ALJ's decision the Commissioner's final decision. Tr. 6; 20 C.F.R. § 404.981.

On January 20, 2009, plaintiff filed a complaint in this Court seeking review of the ALJ's decision. (Dkt. #1). The administrative record was filed with the Court on April 13, 2009. (Dkt. #13). Plaintiff argues the ALJ's decision should be reversed and remanded to the Commissioner for an award of benefits or, in the alternative, for further administrative proceedings for the following reasons:

(a)     the ALJ erred in failing to find plaintiff had a severe mental impairment;

(b)     the ALJ erred in his assessment and consideration of plaintiff's fibromyalgia;

---

[2]The Commissioner employs a five-step "sequential evaluation process" to determine whether a claimant is disabled. See 20 C.F.R. § 404.1520. If the claimant is found disabled or not disabled at any particular step, the disability determination is made at that step, and the sequential evaluation process ends. Id.

(c)     the ALJ erred in finding plaintiff's combined impairments did not meet or equal the criteria of 20 C.F.R. Part 404, Subpart P, Appendix 1, § 12.04;

(d)     the ALJ erred in evaluating the lay witness evidence in the record;

(e)     the ALJ erred in assessing plaintiff's residual functional capacity;

(f)     the ALJ erred in finding plaintiff capable of performing her past relevant work; and

(g)     the ALJ erred in failing to call a vocational expert to testify at the hearing, and in making a determination at step five of the disability evaluation process.[3]

The undersigned agrees the ALJ erred in determining plaintiff to be not disabled, but, for the reasons set forth below, recommends that while the ALJ's decision should be reversed, this matter should be remanded to the Commissioner for further administrative proceedings. Although plaintiff requests oral argument in this matter, the undersigned finds such argument to be unnecessary here.

## DISCUSSION

This Court must uphold the Commissioner's determination that plaintiff is not disabled if the Commissioner applied the proper legal standard and there is substantial evidence in the record as a whole to support the decision. Hoffman v. Heckler, 785 F.2d 1423, 1425 (9th Cir. 1986). Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. Richardson v. Perales, 402 U.S. 389, 401 (1971); Fife v. Heckler, 767 F.2d 1427, 1429 (9th Cir. 1985). It is more than a scintilla but less than a preponderance. Sorenson v. Weinberger, 514 F.2d 1112, 1119 n.10 (9th Cir. 1975); Carr v. Sullivan, 772 F. Supp. 522, 524-25 (E.D. Wash. 1991). If the evidence admits of more than one rational interpretation, the Court must uphold the Commissioner's decision. Allen v. Heckler, 749 F.2d 577, 579 (9th Cir. 1984).

I.     Plaintiff's Date Last Insured

To be entitled to disability insurance benefits, plaintiff "must establish that her disability existed on or before" the date her insured status expired. Tidwell v. Apfel, 161 F.3d 599, 601 (9th Cir. 1998); see also Flaten v. Secretary of Health & Human Services, 44 F.3d 1453, 1460 (9th Cir. 1995) (social security statutory scheme requires disability to be continuously disabling from time of onset during insured status

---

[3]In her opening brief, plaintiff also argues the ALJ erred in refusing to re-open her prior application for disability insurance benefits. (Dkt. #14, p. 21); Tr. 15. In her reply brief, however, plaintiff concedes this argument has no merit. (Dkt. #23, p. 11 n.6). Accordingly, the undersigned finds that issue is no longer before the Court for its consideration.

1 to time of application for benefits, if individual applies for benefits for current disability after expiration of

2 insured status). Plaintiff's date last insured was December 31, 2004. Tr. 15. Therefore, to be entitled to

3 disability insurance benefits, plaintiff must establish she was disabled prior to or as of that date. Tidwell,

4 161 F.3d at 601.

5 II.    The ALJ's Step Two Analysis

6        At step two of the sequential disability evaluation process, the ALJ must determine if an

7 impairment is "severe." 20 C.F.R. § 404.1520. An impairment is "not severe" if it does not "significantly

8 limit" a claimant's mental or physical abilities to do basic work activities. 20 C.F.R. § 404.1520(a)(4)(iii),

9 (c); Social Security Ruling ("SSR") 96-3p, 1996 WL 374181 *1. Basic work activities are those "abilities

10 and aptitudes necessary to do most jobs." 20 C.F.R. § 404.1521(b); SSR 85- 28, 1985 WL 56856 *3.

11        An impairment is not severe only if the evidence establishes a slight abnormality that has "no more

12 than a minimal effect on an individual[']s ability to work." See SSR 85-28, 1985 WL 56856 *3; Smolen v.

13 Chater, 80 F.3d 1273, 1290 (9th Cir. 1996); Yuckert v. Bowen, 841 F.2d 303, 306 (9th Cir.1988). Plaintiff

14 has the burden of proving that her "impairments or their symptoms affect her ability to perform basic work

15 activities." Edlund v. Massanari, 253 F.3d 1152, 1159-60 (9th Cir. 2001); Tidwell v. Apfel, 161 F.3d 599,

16 601 (9th Cir. 1998). The step two inquiry described above, however, is a *de minimis* screening device

17 used to dispose of groundless claims. Smolen, 80 F.3d at 1290.

18        As noted above, at step two of the sequential disability evaluation process, the ALJ found

19 plaintiff's fibromyalgia to be a severe impairment. Tr. 16. The ALJ also found in relevant part that:

20    The undersigned has also made an analysis of the claimant's other alleged impairments
      including bi-polar depression and anxiety, but was unable to document sufficient
21    objective medical signs and laboratory findings of a longitudinal nature – beginning
      prior to the date last insured of December 31, 2004, to justify a finding of a "severe"
22    impairment. For example, the mental status evaluations in the record are fairly
      unremarkable, and when a ("non-practitioner") non-psychiatrist/Nurse Practitioner
23    finally diagnosed the claimant on December 16, 2004 with "PTSD/bi-polar depression"
      the claimant had admittedly "never" been tried on a mood stabilizer. The undersigned
24    further notes that even on that date, the claimant's short-term memory was described as
      "good;" she made "good" eye-contact; her affect although with some tearing as she
25    reported recent suicidal ideation, was appropriate, and she was then started on lamictal
      25 mg. a day with lithium (Exh. 11-F, pp. 3-5). As noted later by Dr. Bolman, M.D.
26    the claimant's mood was **"very responsive"** to prescribed medication (even without
      ongoing psychiatric treatment), and so much so that she was able to stop taking such
27    medications for 8 or 9 months in 2005, and only restarted later in 2006, on a "low" dose
      of lithium and moderate dose of depakote. Based on the record, then, Dr. Bolman,
28    M.D. concluded "there is no support for 12 months of severe impairment that is with a
      well-documented diagnosis at any time (so) . . . the claimant does not meet SSA [Social

Security Administration] criteria . . .” (Exh. 31-F). Based on the evidence, the State Agency physicians agreed that there was “insufficient evidence” of any medically-determinable severe mental impairment beginning prior to December 31, 2004 (Exh. 13-F, & SSR 96-6p), and the undersigned agrees. Therefore, the claimant’s reported ‘bi-polar/depression/anxiety’ will be considered “non-severe” for the purposes of this decision . . .

Id. (emphasis in original). Plaintiff argues that in so finding, the ALJ improperly acted as his own medical expert by rejecting the opinion of the medical expert called to testify at the hearing – who did find she had a severe mental impairment prior to her date last insured – in favor of another non-examining psychiatrist. The undersigned, however, finds no error on the part of the ALJ here.

The ALJ is responsible for determining credibility and resolving ambiguities and conflicts in the medical evidence. Reddick v. Chater, 157 F.3d 715, 722 (9th Cir. 1998). Where the medical evidence in the record is not conclusive, “questions of credibility and resolution of conflicts” are solely the functions of the ALJ. Sample v. Schweiker, 694 F.2d 639, 642 (9th Cir. 1982). In such cases, “the ALJ’s conclusion must be upheld.” Morgan v. Commissioner of the Social Security Administration, 169 F.3d 595, 601 (9th Cir. 1999). Determining whether inconsistencies in the medical evidence “are material (or are in fact inconsistencies at all) and whether certain factors are relevant to discount” the opinions of medical experts “falls within this responsibility.” Id. at 603.

In resolving questions of credibility and conflicts in the evidence, an ALJ’s findings “must be supported by specific, cogent reasons.” Reddick, 157 F.3d at 725. The ALJ can do this “by setting out a detailed and thorough summary of the facts and conflicting clinical evidence, stating his interpretation thereof, and making findings.” Id. The ALJ also may draw inferences “logically flowing from the evidence.” Sample, 694 F.2d at 642. Further, the Court itself may draw “specific and legitimate inferences from the ALJ’s opinion.” Magallanes v. Bowen, 881 F.2d 747, 755, (9th Cir. 1989).

The ALJ must provide “clear and convincing” reasons for rejecting the uncontradicted opinion of either a treating or examining physician. Lester v. Chater, 81 F.3d 821, 830 (9th Cir. 1996). Even when a treating or examining physician’s opinion is contradicted, that opinion “can only be rejected for specific and legitimate reasons that are supported by substantial evidence in the record.” Id. at 830-31. However, the ALJ “need not discuss *all* evidence presented” to him or her. Vincent on Behalf of Vincent v. Heckler, 739 F.3d 1393, 1394-95 (9th Cir. 1984) (citation omitted) (emphasis in original). The ALJ must only explain why “significant probative evidence has been rejected.” Id.; see also Cotter v. Harris, 642 F.2d

700, 706-07 (3rd Cir. 1981); <u>Garfield v. Schweiker</u>, 732 F.2d 605, 610 (7th Cir. 1984).

In general, more weight is given to a treating physician's opinion than to the opinions of those who do not treat the claimant. <u>Lester</u>, 81 F.3d at 830. On the other hand, an ALJ need not accept the opinion of a treating physician, "if that opinion is brief, conclusory, and inadequately supported by clinical findings" or "by the record as a whole." <u>Batson v. Commissioner of Social Security Administration</u>, 359 F.3d 1190, 1195 (9th Cir. 2004); <u>Thomas v. Barnhart</u>, 278 F.3d 947, 957 (9th Cir. 2002); <u>Tonapetyan v. Halter</u>, 242 F.3d 1144, 1149 (9th Cir. 2001). An examining physician's opinion is "entitled to greater weight than the opinion of a nonexamining physician." <u>Lester</u>, 81 F.3d at 830-31. A non-examining physician's opinion may constitute substantial evidence if "it is consistent with other independent evidence in the record." <u>Id.</u> at 830-31; <u>Tonapetyan</u>, 242 F.3d at 1149.

In late June 1999, plaintiff was noted to be "well compensated on Prozac" in terms of her mood. Tr. 219. This is in contrast to plaintiff's self-report in early September 2004, that despite being "treated since the late 70s for depression with various medications . . . nothing" had "ever seemed to work very well for her." Tr. 408. A mental status examination performed at that time showed her to be alert and oriented, and to have good eye contact, with both normal speech and a "very coherent" and organized thought pattern. Tr. 409. She also exhibited no delusional or suicidal behavior. <u>Id.</u> A mood disorder questionaire plaintiff completed at the time, however, "screened her as being at high risk for having bipolar disorder," resulting in a diagnosis of "[p]ossible" bipolar disorder. <u>Id.</u>

Plaintiff reported in late September 2004, that she "found some good relief" on "a trial of Zyprexa," and thus she felt the medication was "working". Tr. 410. In addition to again being alert and oriented and having good eye contact, she was "thoughtful and forthcoming" and seemed to be "very relaxed." <u>Id.</u> This time, her diagnosis was "[b]ipolar disorder most likely with improvement on the Zyprexa." <u>Id.</u> Once more plaintiff reported "getting some benefit from" the Zyprexa in late October 2004, and, although she avoided eye contact "to some degree" and was noted to be crying, her mental status examination performed at the time was otherwise unremarkable. Tr. 411. It was "strongly" suspected that plaintiff had "a mood disorder problem." <u>Id.</u>

In mid-December 2004, plaintiff was evaluated by Lynne A. Dearing, ARNP, who diagnosed her with a "[b]ipolar I disorder, most recent episode depressed severe without psychotic features," and "[p]ost

traumatic stress disorder, probable." Tr. 309.  Ms. Dearing also assessed plaintiff with a global assessment

of functioning ("GAF") score of "50 at present."[4] Id.  In terms of the mental status examination performed

at the time, however, plaintiff had "good" short-term and "fair" long-term memory, was oriented, showed

"good" eye contact, judgment and general fund of information, was able to use abstract reasoning, and

denied any current suicidal or homicidal ideation or hallucinations. Tr. 308.  In addition, plaintiff's affect

was varied, her speech was "within normal limits," and there was "[n]o evidence of a thought disorder."

Id. Lastly, plaintiff admitted that her "mood swings" did "not seem as high or as low as they" had been "in

the past." Id.  In early January 2005, plaintiff reported she felt things were "improving" since going to see

Ms. Dearing, who "started her on lithium and Lamictal." Tr. 412.  She was diagnosed with fatigue,

possibly due in part to depression. Tr. 413.  In late March 2005, she again was diagnosed with fatigue,

which could have been "due to her lithium and her bipolar disorder and depression." Tr. 414.

In late March 2006, Bruce Eather, Ph.D., a non-examining, consulting psychologist, affirmed as

written those findings contained in a psychiatric review technique form completed by another individual,

assessing plaintiff's mental condition for the period of June 1, 2001, to December 31, 2004. Tr. 332, 348.

The individual who completed that form found insufficient evidence to rate the severity or duration of any

affective (i.e., bipolar) or anxiety-related (i.e., probable posttraumatic stress) disorder existing during that

period. Tr. 332, 335, 337, 342-43.  Specifically, that individual determined that while the medical evidence

in the record suggested "some underlying difficulties were present" prior to plaintiff's date last insured, the

"paucity of documentation" did not support her allegations of disability, and therefore could not establish

the "existence of [a] severely limiting impairment of function." Tr. 344.

Upon referral from plaintiff's former attorney, a psychological evaluation of her was conducted in

early June 2007, by Donna M. Smith, Psy.D., who based her findings upon plaintiff's reported history, a

mental status examination and psychological testing. Tr. 47-54.  While plaintiff was noted to be oriented

and had intact memory and demonstrated abstract reasoning, she had difficulty with divergent thinking,

"seemed to lose her train of thought quite easily," and "was not able to demonstrate good judgment." Tr.

48.  Plaintiff "stated that she had PTSD [posttraumatic stress disorder] from the rape until she got put on

---

[4]A GAF score is "a subjective determination based on a scale of 100 to 1 of 'the clinician's judgment of the individual's overall level of functioning.'" Pisciotta v. Astrue, 500 F.3d 1074, 1076 n.1 (10th Cir. 2007) (quoting Diagnostic and Statistical Manual of Mental Disorders (Text Revision 4th ed. 2000) ("DSM-IV-TR") at 34).  A GAF score of 50 reflects serious limitations in the general ability to perform basic tasks of daily life. England v. Astrue, 490 F.3d 1017, 1023, n.8 (8th Cir. 2007).

REPORT AND RECOMMENDATION

Page - 7

the right medications." Tr. 49. Psychological testing showed her to be "of average intelligence," and she seemed "to consistently function in this range." Tr. 50.

Dr. Smith found plaintiff's "profile" suggested someone who was "experiencing significant distress about her physical functioning," and indicated "major problems" with anxiety, depression, memory, and concentration. Tr. 51-52. "Her ability to attend and stay focused" also were deemed to be "seriously compromised." Tr. 51. Overall, Dr. Smith found plaintiff's profile was consistent with a diagnosis of major depression and anxiety, as well as with the presence of an avoidant personality pattern and/or traits. Tr. 52-53. Specifically, Dr. Smith diagnosed her with a bipolar I disorder, PTSD and a GAF score of 40-45.[5] Tr. 53.

Dr. Smith concluded that plaintiff had "never really functioned well if one" looked at her "history", that "the longer" a bipolar disorder "goes untreated, the more difficult it is to stabilize, once treatment is received," and that "[t]his is likely what" had "taken place with" her. Id. In terms of plaintiff's functioning and ability to work, Dr. Smith further opined in relevant part as follows:

> It seems reasonable that Dr. [Yun-Sun] Choe's medical records support that, at least as far back as July 31, 2002, Ms. Blackman was not able to consistently perform work duties. While she may have helped out in her husband's business once in awhile, there is no evidence to support that she was working full time, or that she was able to consistently work on a daily, 8-9 hour basis. Given the medical records, and her history, this is the onset date that I could verify with the records I received.

> Ms. Blackman appears to be a very credible person, who is not intending to present herself as anything other than who she is. She has obvious problems, both physically and psychologically. She is not able to function consistently in a work setting. Her Bipolar Disorder appears to be only marginally managed on her medication regimen. She still experiences a great deal of depression and hopelessness. She had a great deal of difficulty staying focused during the testing and interview. She had to move around a great deal and was in obvious pain. The combination of chronic pain and Bipolar Disorder are a difficult mix. Both create problems in concentration and thought processing. Together, the problem is compounded.

> Given her history, the outcome of my evaluation and observation, it is my professional opinion that Ms. Blackman should be strongly considered for disability support, as she is in no way able to perform normal work-day duties on a consistent basis.

Tr. 54. At the same time, Dr. Smith also completed a medical source statement form, in which she found

---

[5]"A GAF score of 41-50 indicates '[s]erious symptoms . . . [or] serious impairment in social, occupational, or school functioning,' such as an inability to keep a job." Pisciotta, 500 F.3d at 1076 n.1 (quoting DSM-IV-TR at 34).

plaintiff had a number of moderate and marked mental functional limitations.[6] Tr. 55-57.

At the request of the previous ALJ in this matter, William M. Bolman, M.D., a non-examining, consulting physician, was asked to review the medical evidence in the record, and to provide an opinion regarding whether plaintiff met or equaled the Listings during the period from June 2, 2001, to December 31, 2004. Tr. 539. In his evaluation report, Dr. Bolman summarized the medical evidence in the record that he reviewed, and commented specifically with respect to Ms. Dearing's findings that:

> . . . *It does look as if Ms. Dearing's diagnosis of Bipolar was correct, and it is good to see how responsive it was to a combination of moderately low dose lithium carbonate and Lamictal. Indeed, it was so good that the claimant appears to have been symptom free from 3/7/05 until 12/5/05, during which time the claimant stopped taking her meds. They were restarted on 12/6/05 and the claimant again responded. . . .*

Tr. 540 (emphasis in original). In terms of Dr. Smith's findings, Dr. Bolman further commented:

> . . . Dr. Smith's psychological tests find normal intelligence and evidence of psychological distress. Surprisingly, she did not inquire about the claimant's medication status. The past history is more detailed than that of Ms. Dearing, and contains a great deal of impressionistic speculation about the claimant's adjustment earlier in her life. It should be noted that the evaluation was done "to determine her current level of psychological disability in preparation of her SSI hearing." In the impressionistic portion of the exam, Dr. Smith speculates about the claimant's functioning in 2002 to 2004. Unfortunately, this type of reasoning does not provide an objective basis for determining diagnosis or level of impairment.

Tr. 541. Accordingly, Dr. Bolman concluded as follows:

> . . . This 60-year old woman may have a [sic] affective disorder of bipolar type, but there is not much objective documentation of this except for the excellent clinical work of psychiatric nurse Dearing. During 2004 to 2006. Even then her mood disorder was very responsive to medications, so much so that the claimant stopped her medications for 8 to 9 months in 2005, and when she resumed it was on either a low dose of lithium or a moderate dose of Depakote. In any case there is no support for 12 months of severe impairment that is with a well-documented diagnosis at any time where there are records. Thus, there is even less support for undocumented speculation for the 3 years before this. It may be possible, but it is far from probable.

> . . . The claimant does not meet SSA criteria for a Listing of Impairments.

Id.

At the hearing, the medical expert, Dr. John Dusay, testified that based on his review of plaintiff's testimony and the evidence in the record, prior to December 31, 2004, plaintiff had a bipolar II disorder, probable PTSD, and "a severe history of pain syndrome." Tr. 589-90. Dr. Dusay testified that he agreed

---

[6]A "moderate" limitation being defined as one "which seriously interferes with the individual's ability to perform the designated activity on a regular and sustained basis, i.e., 8 hours a day, 5 days a week, or an equivalent work schedule," and a "marked" limitation defined as precluding the ability to perform such activity. Tr. 55.

with Ms. Dearing regarding her assessment in December 2004 that plaintiff had a GAF score of 50. Tr. 591. He further testified that he thought she had "a moderately severe impairment level at that time." Id. In addition, Dr. Dusay testified that on or before December 16, 2004, plaintiff "would have had marked difficulties in persistence, pace or concentration due to a combination of" both her "mood disorder" and a "[s]omatoform disorder." Tr. 592. She also would have been, Dr. Dusay testified, "moderately impaired" in her activities of daily living and in her social functioning. Id.

Dr. Dusay testified as well that "at least back to '02 when plaintiff started seeing" Yun-Sun Choe, M.D., she would have "marked difficulties in carrying out a normal workday" if her "chronic fatigue" was factored in. Tr. 593-94. Dr. Dusay also testified that it would be "fair to say" that her impairments would equal Listing 12.04, and that she would not "have been able to work in the marketplace." Tr. 593-94. He further testified that there is "plenty of evidence that this was present back to that point and time," but not "very much evidence about how severe it was." Tr. 594.

As pointed out by plaintiff, an ALJ may not substitute his or her own opinion for the findings and opinion of a physician. See Gonzalez Perez v. Secretary of Health and Human Services, 812 F.2d 747, 749 (1st Cir. 1987); see also McBrayer v. Secretary of Health and Human Services, 712 F.2d 795, 799 (2nd Cir. 1983) (ALJ cannot arbitrarily substitute own judgment for competent medical opinion); Gober v. Mathews, 574 F.2d 772, 777 (3rd Cir. 1978) (ALJ not free to set own expertise against that of physician who testified before him). However, while the ALJ may not base his decision on "his own expertise," he or she is free to choose "between properly submitted medical opinions." Gober, 574 F.2d at 777; Whitney v. Schweiker, 695 F.2d 784, 788 (7th Cir. 1982) (ALJ should avoid commenting on meaning of medical findings without supporting medical expert testimony). This is what the ALJ properly did here.

As noted above, the ALJ found the mental status examinations of plaintiff in the record, including that performed by Ms. Dearing, to be "fairly unremarkable." Tr. 16. The ALJ went on to note, as did Dr. Bolman, that plaintiff responded well to medication, to the point where for an eight to nine-month period of time in 2005, i.e., shortly after her insured status expired, she was able to stop taking it. Id. Further, as observed by the ALJ, both Dr. Eather and Dr. Bolman found insufficient evidence to establish the existence of "any medically-determinable severe mental impairment beginning prior to December 31, 2004." Id. As such, there is plenty of objective medical evidence in the record, including that provided by

these two non-examining, consulting medical sources, on which the ALJ properly could rely to reject the testimony of Dr. Dusay, who, it should be noted, is a non-examining, consulting medical source as well.

Plaintiff argues the ALJ improperly relied on that evidence, however, because unlike Dr. Dusay, the non-examining, consulting medical sources upon which the ALJ relied, did not have the benefit of the lay witness evidence in the record, discussed in greater detail below, or plaintiff's testimony, and perhaps did not have Dr. Choe's records to review. Plaintiff further complains that she was not able to cross-examine those non-examining, consulting medical sources. As to this last point, plaintiff cites to no legal source, nor is the undersigned aware of any, requiring an ALJ to provide a claimant with the opportunity to cross-examine such non-examining medical sources. The record, furthermore, shows that plaintiff was able to, and did, submit objective medical evidence from her own consulting medical source, Dr. Smith, which her prior attorney in this matter had obtained.

It certainly may be, furthermore, that both the lay witness evidence and plaintiff's testimony would have provided the non-examining medical sources on whom the ALJ relied, with additional information. That information would not have been relevant for purposes of their evaluations, though, as those sources were tasked with determining whether prior to her date last insured, plaintiff had a severe impairment that met or equaled any of the Listings, a determination that is based only on the objective medical evidence in the record. <u>See</u> SSR 85-28, 1985 WL 56856 *4; SSR 96-8p, 1996 WL 374184 *2.[7] The ALJ, furthermore, determined plaintiff's testimony to be not fully credible, a determination plaintiff has not challenged in this forum. <u>See</u> Tr. 20-21, 23. As to plaintiff's statement that those non-examining, consulting medical sources

---

[7]Although the ALJ must take into account a claimant's pain and other symptoms at step two of the sequential disability evaluation process (<u>see</u> 20 C.F.R. § 404.1529), the severity determination at that step is made solely on the basis of the objective medical evidence in the record:

A determination that an impairment(s) is not severe requires a careful evaluation of the medical findings which describe the impairment(s) and an informed judgment about its (their) limiting effects on the individual's physical and mental ability(ies) to perform basic work activities; thus, an assessment of function is inherent in the medical evaluation process itself. <u>At the second step of sequential evaluation, then, medical evidence alone is evaluated in order to assess the effects of the impairment(s) on ability to do basic work activities.</u> If this assessment shows the individual to have the physical and mental ability(ies) necessary to perform such activities, no evaluation of past work (or of age, education, work experience) is needed. Rather, it is reasonable to conclude, based on the minimal impact of the impairment(s), that the individual is capable of engaging in SGA.

SSR 85-28, 1985 WL 56856 *4 (emphasis added). In addition, the determination conducted at step three of the disability evaluation process also must be made on the basis of medical factors alone. SSR 96-8p, 1996 WL 374184 *2.

perhaps did not have Dr. Choe's records to review, she has not made any showing that this is in fact so, and thus fails to present a real issue here. In any event, Dr. Choe is noy a psychiatrist a psychologist, nor did he provide any opinion regarding plaintiff's mental impairments.

What plaintiff essentially is arguing here, is that the objective medical evidence the ALJ relied on to make his step two determination is not as reliable as the testimony provided by Dr. Dusay. Determinations as to the reliability or credibility of medical sources, however, are solely the ALJ's to make. See Reddick, 157 F.3d at 722; Sample, 694 F.2d at 642; Morgan, 169 F.3d at 601. Further, where, as here, the objective medical evidence admits of more than one rational interpretation, the Court must uphold that adopted by the ALJ. Allen v. Heckler, 749 F.2d 577, 579 (9th Cir. 1984). Plaintiff thus may disagree with the ALJ in giving more weight to the findings of the other non-examining, consulting medical sources in the record than he did to Dr. Dusay's testimony. But given that the objective medical evidence in the record for the most part supports their findings for the period prior to or as of plaintiff's date last insured, those findings, and therefore the ALJ's here as well, are supported by substantial evidence.

Plaintiff further asserts, though, that the ALJ failed to discuss or assess Dr. Dusay's testimony, or to give any explanation as to why he rejected that testimony. This assertion is without merit, as the ALJ gave the following specific and legitimate reasons for not adopting it:

> The medical expert, a psychiatrist, testified that that [sic] the claimant had a severe bipolar II disorder with probably PTSD, and a pain syndrome vs. chronic fatigue condition which had been presumed by doctors to represent fibromyalgia. However, as explained above, because of the vague and lack of significant objective findings in the record both prior to and after the above-referenced December 16, 2004 report by the claimant's non-psychiatrist Nurse Practitioner, along with the claimant's successful mood control by starting mood stabilizers – so much so, that she was able to stop taking them completely for 8 or 9 months in 2005, etc., the undersigned has agreed with the medical opinions of the State Agency physicians and Dr. Bolman, respectively, that the claimant's reported mental impairment – at least beginning prior to December 31, 2004, was "non-severe" only . . .
>
> . . .
>
> Again, the record does not actually corroborate an ongoing Axis I treatment diagnosis until December 16, 2004, and even then, it had been made by a Nurse Practitioner, based on what appears to have been essentially normal mental status evaluations, without actual psychiatric treatment and no history of mood stabilizers prior to this date, and with such a degree of improvement realized when she began taking them that the claimant was able to go without psychotropic medications (and any actual psychiatric treatment) for 8 or 9 months in 2005. For this reason, the undersigned does not accept the medical opinion as testified by the medical expert that the December 16,

2004 report alone would be sufficient to justify a finding that the claimant had a "severe" and longitudinally disabling bi-polar disorder beginning prior to December 31, 2004. In fact, the next psychiatric evaluation from a psychologist or psychiatrist is dated June 1, 2007, or 2½ years after the date last insured (Exh. 30-F).

Tr. 18, 21. As discussed above, the substantial objective medical evidence in the record supports the ALJ's determination on this issue. In addition, while not argued by plaintiff, that evidence also supports the ALJ in rejecting the report of Dr. Smith, an examining physician, which, as the ALJ noted, was issued "**more than 3 years after the date last insured**," and lacks medical documentation of severe mental impairments going back prior to the date last insured. Tr. 18 (emphasis in original).

III.     The ALJ's Treatment of Plaintiff's Fibromyalgia

       In early May 2006, plaintiff's treating physician, Yun-Sun Choe, M.D., wrote a letter to plaintiff's former attorney, in which he stated that:

I am writing to respond to your questions about Mrs. Gloria Blackman.

The question number 1 asks if Gloria had been able, on a regular and sustained basis, 8 hours a day, five days a week to engage in sedentary, light or medium work as defined by the Social Security Definitions. When I saw Gloria for the first time on July 31, 2002 she was not working due to pain and her inability to think clear [sic]. She also was suffering from other non-specific constitutional symptoms including fatigue, tiredness and recurrent migraine attacks.

The question number 2 asks if Gloria's complaints are associated with clinically demonstrated impairments that could reasonably be expected to produce the claimed symptoms. The complaints she has are again non-specific symptoms commonly observed in patients with fibromyalgia syndrome. These are all subjective symptoms without objective measurements.

The question number 3 asks if her complaints are credible. I find Gloria to be truthful to her complaints.

With regard to question number 4, on a more probable than not basis, the combination of work and her underlying complaints, she would have resulted in absenteeism of 3 or more days per month.

Tr. 393. With respect to that letter, the ALJ found as follows:

The undersigned does not accept the retrospective medical opinion – at the request and coaching by former counsel, of the claimant's treating physician Yun-Sun Choe, M.D. that due to her "all subjective symptoms without objective measurements," the claimant would on a "more probable than not basis" have missed 3 or more workdays a month since (when she was first seen by this doctor on July 31, 2002) (Exh. 21-F, p. 2, and B33-34) because of the regularly employed word choice **"stable"** assigned the claimant's fibromyalgia in his treatment notes, on December 16, 2003 for example (Exh. 22-F, p. 4); on April 7, 2006 (Exh. 21-F, p. 10); and February 2, 2007, "the labs came back normal . . . FMS *stable* . . ." (Exh. 27-F, p. 5), etc., and "improved" on January 3, 2006, etc. (Exh. 9-F, p. 9). Because this medical opinion is not supported by the individual ongoing treatment notes from Dr. Choe, it has been accorded only very

little weight by the undersigned.

Tr. 19-20 (emphasis in original). Plaintiff argues the ALJ erred in rejecting Dr. Choe's opinion, and thus in assessing and considering her fibromyalgia. The undersigned disagrees.

First, plaintiff points out that there is no indication in the record that her former attorney coached Dr. Choe's opinion, and thus that accusation on the part of the ALJ is not a proper basis for discounting it. It is true that absent "evidence of actual improprieties," the purpose for which a medical opinion report is obtained is not a legitimate basis for rejecting that report. See Lester, 81 F.3d 821, 832 (9th Cir. 1996) ("An examining doctor's findings are entitled to no less weight when the examination is procured by the claimant than when it is obtained by the Commissioner."). To the extent the ALJ did rely on this reason as a basis for rejecting the opinion of Dr. Choe, therefore, he erred, as there is no evidence plaintiff's former attorney did anything improper here. The undersigned finds, however, that any such error was harmless, given the other, valid stated reasons for rejecting it. See Stout v. Commissioner, Social Security Admin., 454 F.3d 1050, 1055 (9th Cir. 2006) (error harmless where it is non-prejudicial to claimant or irrelevant or inconsequential to ALJ's ultimate disability determination).

Plaintiff next argues the ALJ erroneously interpreted the term "stable" as used by Dr. Choe in his progress notes to describe her fibromyalgia. Specifically, plaintiff asserts that in using this term, Dr. Choe merely meant her symptoms were steady, even or constant, for example, rather than symptom-free as the ALJ read its use to mean. Again, the undersigned disagrees. The majority of Dr. Choe's treatment notes show a lack of significant interference in plaintiff's ability to function. For example, in mid-December 2003, he described plaintiff's fibromyalgia as appearing stable, noting only the presence of tenderness. Tr. 281. In mid June 2004, Dr. Choe found she had worsening symptoms, including "multiple muscle tender" points, but again noted no specific functional limitations. Tr. 282. In early January 2006, plaintiff herself reported "[f]eeling better," with only "intermittent" pain and "improved" fatigue. Tr. 283. She was "[f]ully active" and had been walking. Id.

Dr. Choe again found plaintiff's fibromyalgia to be stable, with some local tenderness, pain on hip rotation and mild knee crepitus, in early April 2006. Tr. 401. Again, plaintiff reported that she had been "fully active," that she did "a lot outside" when the weather was nice and that her "[o]verall" her pain level had been "low". Id. In early July 2006, Dr. Choe once more described plaintiff's fibromyalgia as stable.

Tr. 462.  While her back was tender, she reported using Vicodin only "sparingly".  Id.  Stable fibromyalgia with "[w]orsening pain in the feet" was noted in early January 2007, with otherwise fairly unremarkable objective medical findings.  Tr. 463.  Plaintiff's fibromyalgia was stable as well in early February 2007, and, although tender points in her lumbar spine were noted, she had good shoulder range of motion, and reported being able to walk "a mile" before getting pain in her low back.  Tr. 464.

In early May 2007, plaintiff reported noticing "some improvement" in her pain, and Dr. Choe noted that her fibromyalgia was stable, "[d]oing little better" on medication, with normal objective findings.  Tr. 546.  Normal objective findings and stability again were noted in late August 2007.  Tr. 547.  Accordingly, Dr. Choe's use of the term "stable" for the most part coincided with either normal or fairly unremarkable objective medical findings, and self-reports by plaintiff of symptom improvement and a not insignificant amount of physical activity.  To the extent the ALJ equated the term "stable" with symptom improvement or symptom absence, therefore, he did not act unreasonably in doing so, or, at the very least, it is a rational interpretation of the evidence in the record, which, as noted above, the Court must uphold, even if there is another such interpretation he could have chosen.  See Allen, 749 F.2d at 579.

IV.    The ALJ's Step Three Analysis

At step three of the sequential disability evaluation process, the ALJ must evaluate the claimant's impairments to see if they meet or equal any of the impairments listed in 20 C.F. R. Part 404, Subpart P, Appendix 1 (the "Listings"). 20 C.F.R § 404.1520(d); Tackett v. Apfel, 180 F.3d 1094, 1098 (9th Cir. 1999).  If any of the claimant's impairments meet or equal a listed impairment, he or she is deemed disabled.  Id.  The burden of proof is on the claimant to establish he or she meets or equals any of the impairments in the Listings.  Tacket, 180 F.3d at 1098.  However, "[a] generalized assertion of functional problems is not enough to establish disability at step three." Id. at 1100 (citing 20 C.F.R. § 404.1526).

A mental or physical impairment "must result from anatomical, physiological, or psychological abnormalities which can be shown by medically acceptable clinical and laboratory diagnostic techniques." 20 C.F.R. § 404.1508.  It must be established by medical evidence "consisting of signs, symptoms, and laboratory findings." Id.; see also SSR 96-8p, 1996 WL 374184 *2 (determination that is conducted at step three must be made on basis of medical factors alone).  An impairment meets a listed impairment "only when it manifests the specific findings described in the set of medical criteria for that listed impairment."

SSR 83-19, 1983 WL 31248 *2.

An impairment, or combination of impairments, equals a listed impairment "only if the medical findings (defined as a set of symptoms, signs, and laboratory findings) are at least equivalent in severity to the set of medical findings for the listed impairment." Id.; see also Sullivan v. Zebley, 493 U.S. 521, 531 (1990) ("For a claimant to qualify for benefits by showing that his unlisted impairment, or combination of impairments, is 'equivalent' to a listed impairment, he must present medical findings equal in severity to *all* the criteria for the one most similar listed impairment.") (emphasis in original). However, "symptoms alone" will not justify a finding of equivalence. Id. The ALJ also "is not required to discuss the combined effects of a claimant's impairments or compare them to any listing in an equivalency determination, unless the claimant presents evidence in an effort to establish equivalence." Burch v. Barnhart, 400 F.3d 676 (9th Cir. 2005).

The ALJ need not "state why a claimant failed to satisfy every different section of the listing of impairments." Gonzalez v. Sullivan, 914 F.2d 1197, 1201 (9th Cir. 1990) (finding ALJ did not err in failing to state what evidence supported conclusion that, or discuss why, claimant's impairments did not meet or exceed Listings). This is particularly true where, as noted above, the claimant has failed to set forth any reasons as to why the Listing criteria have been met or equaled. Lewis v. Apfel, 236 F.3d 503, 514 (9th Cir. 2001) (finding ALJ's failure to discuss combined effect of claimant's impairments was not error, noting claimant offered no theory as to how, or point to any evidence to show, his impairments combined to equal a listed impairment).

The ALJ found plaintiff's fibromyalgia was "not 'severe' enough to meet or medically equal, either singly or in combination, one of the impairments" contained in the Listings. Tr. 18-19. Plaintiff argues Dr. Dusay's testimony – that as of July 31, 2002, the combination of her fibromyalgia/somatoform disorder, as well as her depression, precluded her from working – supports a finding of equivalency. She further argues the ALJ erred in not discussing that testimony in terms of equivalency. The undersigned, though, finds no error here. Because, as discussed above, the ALJ properly rejected the testimony of Dr. Dusay, and instead found the substantial evidence in the record failed to establish the existence of a severe mental impairment prior to plaintiff's date last insured, there also is no substantial evidence in the record to support a finding of equivalence based in part on such an impairment.

V.    The ALJ's Evaluation of the Lay Witness Evidence in the Record

Lay testimony regarding a claimant's symptoms "is competent evidence that an ALJ must take into account," unless the ALJ "expressly determines to disregard such testimony and gives reasons germane to each witness for doing so." Lewis v. Apfel, 236 F.3d 503, 511 (9th Cir. 2001).  In rejecting lay testimony, the ALJ need not cite the specific record as long as "arguably germane reasons" for dismissing the testimony are noted, even though the ALJ does "not clearly link his determination to those reasons," and substantial evidence supports the ALJ's decision. Id. at 512.  The ALJ also may "draw inferences logically flowing from the evidence." Sample, 694 F.2d at 642.

The record contains statements from three lay witnesses, plaintiff's friend, husband and sister, who each related their observations of her symptoms and limitations.  See Tr. 103-04, 106, 108.  The ALJ, with respect to those statements, found as follows:

> The claimant's life-long friend Rowena Hoffman admitted in a 2008 Third Party
> Declaration, that she had not lived near the claimant from 1998 until May 2005 (Exh.
> E111-112), which frankly avoids the entire relevant period, so is not very helpful.
> Similarly, circa April 30, 2008 and May 2008, respectively, the claimant's husband
> Charles and her sister Carol Quimby, reported that "for several years" they had
> observed that the claimant was much more fatigued, and had more shakiness in her
> hands and arms.  Again, the relevant period reflected in the date last insured of
> December 31, 2004, would fall before "the past several years" when Mr. Blackman
> believed his wife, and Ms. Quimby, her sister, had been unable to work (Exh. E108).
> For these reasons, the undersigned accords much less weight to the Third Party
> Declarations submitted by the claimant's friend and family members or more weight to
> the above-physicians.

Tr. 20-21.

Plaintiff argues the ALJ's consideration and analysis of this lay witness evidence is flawed.  First, plaintiff asserts Ms. Hoffman did speak to how she had deteriorated since 1998, based upon her twice-a-year visits.  As plaintiff admits, however, Ms. Hoffman's more detailed observations primarily concern the period as of May 2005. See Tr. 103-04.  In addition, while Ms. Hoffman did state that "between 1998 and 2005," she observed plaintiff's mental and physical condition deteriorate and gradually worsen, she did not get any more specific than this for that entire period. Tr. 103.  The undersigned thus finds the ALJ did not err in giving more weight to the substantial objective medical evidence in the record regarding plaintiff's condition for the period prior to and as of her date last insured.

The undersigned does agree with plaintiff, however, that the ALJ erred in rejecting the lay witness statements provided by her husband and sister, on the basis that neither of those statements concerned the

relevant time period. Mr. Blackman, for example, stated plaintiff had "not had much energy to do things, and this" had "been true for the past five or six years at least." Tr. 106. In addition, Mr. Blackman stated he had noticed plaintiff's hands and arms had "become shaky the past few years making it difficult for her to hold on to things." Id. While it is unclear from Mr. Blackman's statement as to what he meant by "past few years," given that the statement is dated April 30, 2008, it certainly is possible that it covered a period dating back to before December 31, 2004. At the very least, therefore, the ALJ should have inquired into this issue further so as to clear up this ambiguity. For the same reason, the ALJ also should have inquired further regarding the statement by plaintiff's sister provided in early May 2008, that plaintiff seemed to get "distracted easily," which had "been going on for several years." Tr. 108.

VI.     The ALJ's Assessment of Plaintiff's Residual Functional Capacity

If a disability determination "cannot be made on the basis of medical factors alone at step three of the evaluation process," the ALJ must identify the claimant's "functional limitations and restrictions" and assess his or her "remaining capacities for work-related activities." SSR 96-8p, 1996 WL 374184 *2. A claimant's residual functional capacity ("RFC") assessment is used at step four to determine whether he or she can do his or her past relevant work, and at step five to determine whether he or she can do other work. Id. It thus is what the claimant "can still do despite his or her limitations." Id.

A claimant's residual functional capacity is the maximum amount of work the claimant is able to perform based on all of the relevant evidence in the record. Id. However, a claimant's inability to work must result from his or her "physical or mental impairment(s)." Id. Thus, the ALJ must consider only those limitations and restrictions "attributable to medically determinable impairments." Id. In assessing a claimant's RFC, the ALJ also is required to discuss why the claimant's "symptom-related functional limitations and restrictions can or cannot reasonably be accepted as consistent with the medical or other evidence." Id. at *7.

As noted above, the ALJ found plaintiff had the residual functional capacity to perform "a wide range of 'light' work," with the additional limitations that she "should not walk for greater than one mile at a time, and should be allowed to change positions or take a short break from prolonged sitting every two hours to stretch her legs." Tr. 23. Plaintiff argues the ALJ erred in assessing her RFC, in light of the errors he made in evaluating the medical and lay witness evidence in the record. However, as discussed above,

the ALJ did not err in evaluating the medical evidence in the record. Also as discussed above, though, the ALJ did err in evaluating the lay witness evidence from plaintiff's husband and sister. Because of this, the undersigned cannot say the ALJ's assessment of plaintiff's residual functional capacity accurately describes all of her mental and physical limitations.

VII.    The ALJ's Step Four Findings

Plaintiff has the burden at step four of the sequential disability evaluation process to show that she is unable to return to her past relevant work. Tackett v. Apfel, 180 F.3d 1094, 1098-99 (9th Cir. 1999). As noted above, the ALJ found plaintiff capable of performing her past relevant work. Plaintiff again argues the ALJ erred in so finding due to his errors in evaluating both the medical and lay witness evidence in the record. For the same reason the undersigned was not able to say the ALJ's RFC assessment was accurate, it also is unclear – in light of the ALJ's error in evaluating the statements of plaintiff's husband and sister, but not the objective medical evidence – whether the ALJ's step four determination here is supported by the substantial evidence in the record.

VIII.   Step Five of the Sequential Disability Evaluation Process

Plaintiff argues that because the ALJ erred in finding her capable of returning to her past relevant work at step four of the sequential disability evaluation process, the ALJ further erred by failing to make any determination at step five as to whether she is capable of performing other work existing in significant numbers in the national economy. As noted above, however, if a claimant is found disabled at any step of the disability evaluation process, including step four, the disability determination is made at that step, and the process ends. See 20 C.F.R. § 404.1520. As such, the ALJ did not err in stopping at step four, and not proceeding on to step five, because he found plaintiff could return to her past relevant work, which results in a not-disabled finding.

In addition, as discussed above, it is merely unclear as to whether plaintiff can return to her past relevant work, which, as explained below, requires remand for further administrative proceedings and re-consideration of this issue. Plaintiff goes on to argue that Dr. Dusay's testimony supports a finding at step five that she is unable to perform other jobs existing in significant numbers in the national economy.[8] This

_____

[8]If a claimant cannot perform his or her past relevant work, at step five of the disability evaluation process the ALJ must show there are a significant number of jobs in the national economy the claimant is able to do. Tackett, 180 F.3d at 1098-99; 20 C.F.R. § 404.1520(d), (e).

1    argument is without merit, though, since, as discussed above, the ALJ properly rejected that testimony as

2    being unsupported by the medical evidence in the record.  Plaintiff argues as well that on remand the ALJ

3    should call a vocational expert to testify as to her ability to perform such jobs.  However, the ALJ will be

4    required to do so only if it is determined on remand that plaintiff cannot perform her past relevant work,

5    and that vocational testimony is necessary to make a step five determination.

6    IX.     This Matter Should Be Remanded for Further Administrative Proceedings

7           The Court may remand this case "either for additional evidence and findings or to award benefits."

8    Smolen, 80 F.3d at 1292.  Generally, when the Court reverses an ALJ's decision, "the proper course,

9    except in rare circumstances, is to remand to the agency for additional investigation or explanation."

10   Benecke v. Barnhart, 379 F.3d 587, 595 (9th Cir. 2004) (citations omitted).  Thus, it is "the unusual case in

11   which it is clear from the record that the claimant is unable to perform gainful employment in the national

12   economy," that "remand for an immediate award of benefits is appropriate." Id.

13          Benefits may be awarded where "the record has been fully developed" and "further administrative

14   proceedings would serve no useful purpose." Smolen, 80 F.3d at 1292; Holohan v. Massanari, 246 F.3d

15   1195, 1210 (9th Cir. 2001).  Specifically, benefits should be awarded where:

16          (1) the ALJ has failed to provide legally sufficient reasons for rejecting [the claimant's]
             evidence, (2) there are no outstanding issues that must be resolved before a
17           determination of disability can be made, and (3) it is clear from the record that the ALJ
             would be required to find the claimant disabled were such evidence credited.
18
19   Smolen, 80 F.3d 1273 at 1292; McCartey v. Massanari, 298 F.3d 1072, 1076-77 (9th Cir. 2002).  Because

20   issues still remain as to the credibility of the statements of plaintiff's husband and sister, plaintiff's

21   residual functional capacity and her ability to return to her past relevant work, this matter should be

22   remanded to the Commissioner for further administrative proceedings.  As discussed above, if on remand,

23   plaintiff should be found incapable of returning to her past relevant work, the Commissioner shall

24   determine if she is able to perform other work existing in significant numbers in the national economy at

25   step five of the sequential disability evaluation process.  In addition, should be determined that the

26   testimony of a vocational expert is needed to make the step five determination, such also shall be obtained

27   on remand.

28          Plaintiff argues the lay witness evidence the ALJ erred in evaluating must be credited as true.  It is

     true that where lay witness evidence is improperly rejected, that evidence may be credited as a matter of

law. See Schneider v. Barnhart, 223 F.3d 968, 976 (9th Cir. 2000) (finding when lay evidence rejected by ALJ is given effect required by federal regulations, it became clear claimant's limitations were sufficient to meet or equal listed impairment). As noted by the Ninth Circuit, though, courts do have "some flexibility" in how they apply the "credit as true" rule. Connett, 340 F.3d at 876. In addition, Schneider dealt with the situation where the Commissioner failed to cite any evidence to contradict the statements of five lay witnesses regarding her disabling impairments. 223 F.3d at 976. Here, however, the objective medical evidence in the record, as discussed above, supports the ALJ's findings concerning the effects plaintiff's alleged impairments have had on her ability to function.

CONCLUSION

Based on the foregoing discussion, the Court should find the ALJ improperly concluded plaintiff was not disabled, and should reverse the ALJ's decision and remand this matter to the Commissioner for further administrative proceedings in accordance with the findings contained herein.

Pursuant to 28 U.S.C. § 636(b)(1) and Federal Rule of Civil Procedure ("Fed. R. Civ. P.") 72(b), the parties shall have ten (10) days from service of this Report and Recommendation to file written objections thereto. See also Fed. R. Civ. P. 6. Failure to file objections will result in a waiver of those objections for purposes of appeal. Thomas v. Arn, 474 U.S. 140 (1985). Accommodating the time limit imposed by Fed. R. Civ. P. 72(b), the clerk is directed set this matter for consideration on **November 20, 2010**, as noted in the caption.

DATED this 23rd day of October, 2009.


Karen L. Strombom
United States Magistrate Judge